**MCMANIMON, SCOTLAND & BAUMANN, LLC**
427 Riverview Plaza
Trenton, New Jersey 08611
(609) 695-6070
Andrea Dobin (adobin@msbnj.com)
Michele M. Dudas (mdudas@msbnj.com)
*Counsel for Andrea Dobin, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>FRUTTA BOWLS FRANCHISING, LLC,<br><br>Debtor. | Case No. 19-13230 (MBK)<br><br>Honorable Michael B. Kaplan, Chief U.S.B.J.<br><br>Chapter 11<br><br>**Hearing Date and Time:**<br>**December 17, 2020, at 10:00 a.m.** |

**CERTIFICATION OF ANDREA DOBIN, CHAPTER 11 TRUSTEE FOR FRUTTA BOWLS FRANCHISING, LLC, CHAPTER 11 DEBTOR, IN SUPPORT OF MOTION FOR ORDER AUTHORIZING (A) SALE OF DEBTOR'S ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363(b), (f), AND (m); (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS PURSUANT TO 11 U.S.C. § 365; AND (C) GRANTING RELATED RELIEF**

**ANDREA DOBIN**, of full age, certifies as follows:

1. I serve as the Chapter 11 Trustee in the bankruptcy proceeding of Frutta Bowls Franchising, LLC, Chapter 11 debtor (the "Debtor"). I submit this Certification in support of the motion for entry of an Order authorizing the (A) sale of the Debtor's assets, free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(b), (f), and (m); (B) assumption and assignment of certain executory contracts pursuant to 11 U.S.C. § 365; and (C) granting related relief (the "Motion").

2. On February 15, 2019 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101, *et seq.*) in the United States Bankruptcy Court for the District of New Jersey.

3. The Debtor is owned by Brooke Gagliano ("B. Gagliano") and her father, Patrick Gagliano ("P. Gagliano").

4. The Debtor is a franchisor of the Frutta Bowls franchise, a fruit bowl business that specializes in products featuring acai as its main component. Through mid-June, 2020, the day-to-day operations of the Debtor's business were conducted by B. Gagliano.

5. The Debtor designated this Chapter 11 case as a small business case pursuant to Fed. R. Bankr. P. 1020.

A. **Debtor's Business and Assets**

6. According to information provided to me, Frutta Bowls, LLC ("Bowls"), an entity owned by B. Gagliano, licensed the Debtor certain intellectual property utilized by the franchisees, including a system relating to the establishment, development and operation of Frutta Bowls businesses including certain know-how, trade secrets, copyrighted material (registered or unregistered) and trademarks, including the service mark "Frutta Bowls" design (U.S. Reg. No. 5184834), word mark, "Frutta Bowl" (Serial No. 87593542 – application pending), and word mark "This is How I Frutta" (Serial No. 87574888 – application pending) and other unregistered trade names, trademarks, service marks, logos, trade dress, commercial symbols and proprietary rights (collectively, "IP").

7. On April 15, 2019, an Official Committee of Unsecured Creditors ("Committee") was formed (Docket No. 60).

8. On January 27, 2020, along with the Committee, the Debtor filed its First Modified Small Business Chapter 11 Combined Plan and Disclosure Statement (Docket No. 225) ("Combined Plan").

9. The Combined Plan was objected to by various parties, including former franchisees (Docket No. 256) and the Office of the United States Trustee (Docket No. 258).

10. In addition to the objections filed to the Plan, the Debtor's franchisees were impacted by the COVID-19 pandemic ("Pandemic"), which forced some struggling locations out of business permanently. It had a direct impact on the Debtor's business operations.

11. As a result, including mounting administrative costs, the Debtor moved to convert the Chapter 11 case to Chapter 7 ("Motion to Convert") (Docket No. 294). In response to the Motion to Convert, the Committee filed a Cross-Motion for the appointment of a Chapter 11 Trustee ("Cross-Motion") (Docket No. 297).

12. By Order entered May 22, 2020, the Debtor's Motion to Convert was denied, and the Committee's Cross-Motion was granted (Docket No. 302).

13. On May 22, 2020, I was appointed as Trustee (Docket No. 304). On May 26, 2020, an Order was entered confirming the appointment (Docket No. 307).

14. Immediately after the appointment, I convened various calls to obtain information regarding the Debtor's business operations, including a call with the franchisees.

15. Through my investigation, I learned that the fact that Debtor did not own the IP was disturbing to many of the franchisees; they alleged that this fact was not adequately disclosed by the Debtor in the Franchise Disclosure Document, as same was amended. I quickly understood that this structure would virtually eliminate any prospect for sale of the Debtor's business.

16. On June 2, 2020, B. Gagliano tendered her resignation from the Debtor.

17. I negotiated terms for a Management Agreement ("Management Agreement") with RACG, LLC ("Manager"), to operate the Debtor's business, until a time when a purchaser is obtained, or other actions are taken in this Chapter 11 proceeding that prove that there is no need for the services to be rendered by the Manager. The Management Agreement was approved by the Court. (Docket No. 339).

18. The Manager has been operating the Debtor's business since mid-June 2020, and franchisees have acknowledged an increased level of services and marketing being provided through the Manager.

19. On or about July 13, 2020, I came to a final resolution with Bowls, B. Gagliano, P. Gagliano, and related parties, which provided for the voluntary transfer of the IP from Bowls to the Debtor, as well as distribution rights, if any, from Distribution to the Debtor in exchange for mutual releases. On July 14, 2020, I filed a Motion to approve the settlement and compromise with the Court (Docket No. 340), which was approved by Order entered August 14, 2020 (Docket No. 359).

20. By Assignment dated September 24, 2020, with an effective date of August 14, 2020, Bowls and Distribution, respectively transferred their IP and distribution rights, respectively, to the Debtor. A copy of the Assignment is annexed as **Exhibit "A."**

**B. Sale Process**

21. Once I was appointed, it became clear that the sale of the Debtor's business and assets was the only viable option for any prospect of filing a Plan. Exclusivity had been extinguished with my appointment; no other party was coming forward to propose a Plan of Reorganization.

4816-9664-3282, v. 1

22. That said, my original thought was to begin marketing the Debtor's business for sale in approximately three (3) to four (4) months, after the Manager had a firm grasp on business operations, the effects of the Pandemic subsided and businesses started reopening.

23. Despite this intended course of action, I began contacting various business brokers and investment bankers. The business brokers and investment bankers all indicated that the Debtor was too small for their interest. However, a number of them put me directly in contact with parties which may have an interest in the business. I also contacted anyone that had reached out to the Debtor regarding a potential sale. The franchisees were also advised to forward any leads directly to me.

24. The unanimous feedback I received from the potential purchasers was that they would want to purchase the business sooner rather than later, so that the business could be transitioned and improved before things started getting back to "normal."

25. Each and every potential purchaser indicated that any offer will be contingent upon the Debtor owning the IP.

26. Several conversations with potential purchasers involved not paying the Estate any actual money for the Debtor's assets, but a willingness to invest time and money into improving the Debtor's business and brand. Essentially these parties wanted me to give the Debtor to them, for the sole benefit of the existing franchisees. I declined these offers.

27. As of July 2020, I identified approximately five (5) potential purchasers, and preliminary due diligence came to an end on July 15, 2020.

28. On July 15, 2020, I received two (2) offers. The first was in the amount of $100,000, which also included accounts receivable ("First Offer"). Obviously, the First Offer was not considered by me as it was too low to accomplish a Chapter 11 Plan.

29. The second offer was from a different entity in the amount of $325,000, plus an agreed upon formula for outstanding accounts receivable. I accepted the offer, and that party initiated its due diligence ("Second Offer").

30. While due diligence completed and the party making the Second Offer indicated that it would enter into an asset purchase agreement, those discussions were eventually terminated.

31. As a result, I continued to identify parties which may have an interest in the business and continued to solicit offers. I kept the Committee and existing franchisees aware of the progress of sale (as well as any creditor that contacted me), including the failure of the Second Offer to result in an asset purchase agreement.

32. I spoke with approximately eight (8) more parties expressing what I considered to be a serious interest, as well as several other parties in the field or industry.

33. These parties included other established franchisors with competitive businesses or which were looking to expand their current business, to smaller local business owners, to parties who were franchisees in other types of food establishments, to even some of the franchisees of this Debtor.

34. On August 21, 2020, the party making the First Offer increased its offer to $325,000, which was still not acceptable to me, due in large part because the total purchase price included the Debtor's accounts receivable.

35. In or about early-September 2020, I began discussions with FBH Investments, LLC ("FBH") regarding its potential purchase of the Debtor's assets, and after several follow up discussions, expected an offer would be received from FBH in mid-October, 2020.

36. On Friday, October 16, 2020, the party making the First Offer increased its offer to $400,000, plus additional consideration for "mutually agreed upon" amounts for the accounts receivable.

37. On Monday, October 19, 2020, I had a call with representatives of the party making the First Offer, and expected to receive a more concrete formula for accounts receivable within the next day or so. That party also indicated that its final offer would include a reduction of approximately $10,000 of its purchase price for any store which was open at the time of the offer, but closed prior to the closing date.

38. On the afternoon of October 19, 2020, FBH submitted its formal offer. The final offer made by FBH provided for $400,000 for the purchase price of the Debtor's assets, an assumption and assignment of existing contracts (collectively, the "Transferred Assets"), plus an agreed upon formula for outstanding accounts receivable as of the date of closing. At that point I accepted FBH's offer and rejected the pending First Offer since it would include terms (notably the reduction in the price for any store that closed) that would make it not as good as the offer from FBH.

39. FBH's due diligence was completed on or about November 6, 2020. Through FBH's designee, Frutta Bowls Franchisor, LLC ("Purchaser"), I negotiated and executed the Agreement of Sale ("Agreement") on November 17, 2020. A copy of the Agreement is annexed as **Exhibit "B."**

40. Under the terms of the Agreement, the Purchaser has the right to identify which franchise agreements it wants to assume. Purchaser has engaged in substantial due diligence and will be prepared to notify me quickly of its intentions in this regard. Importantly, the sale price is not contingent upon the assumption of any specified number of franchise locations.

41. The Agreement includes an agreement to compensate Purchaser an amount not to exceed $20,000 should it not be the ultimate purchaser for coming forward with the highest and best offer and negotiating both the sale and Agreement. Purchaser is aware that this payment is subject to application and approval by the Court. However, in light of the fact that so many parties investigated this sale and failed to get to the point of bringing a sale motion to the Court, I believe that they are entitled to this payment as a stalking horse.

42. As set forth in the Agreement, the purchase price contemplated by the sale is $400,000 for the Transferred Assets, plus an additional amount for accounts receivable ("Purchase Price").[1]

### i. The Property is Being Sold in Good Faith, for Value, and Subject to Higher and Better Offers

43. I do not have any relationship with the Purchaser. Upon information and belief, the Purchaser has no relationship with the Debtor or its principals.

44. There are no financing or other contingencies associated with the Agreement, other than obtaining Bankruptcy Court approval.

45. This amount by Purchaser is significantly higher than any formal and informal offers received by me. The cash consideration is substantially higher than the cash component of the Combined Plan.

46. I did not retain a broker or investment banker, so there are no commissions associated with the sale. It should be noted that the time and effort I personally expended in marketing the Debtor's business for sale and fielding offers will be compensated by a Trustee Commission to be included in a forthcoming Plan of Liquidation.

---

[1] I respectfully request to disclose the formula for payment of accounts receivable *in camera* to the Court and to potential bidders pursuant to a Non-Disclosure Agreement. During the pendency of this Motion, I intend to continue to pursue collection of accounts receivable and do not want the current sale process to interfere with those efforts.

8

47. The sale has been negotiated at arms' length and in good faith. I am convinced that the Purchase Price represents the fair market value of the Transferred Assets based upon the feedback I received from potential purchasers, and the multiple other offers I received.

48. I have been actively marketing the Debtor's business since June 2020.

49. The Office of the United States Trustee, Purchaser, any potential bidders or any party having expressed an interest in the Debtor's business and/or Transferred Assets, all non-debtor contract parties, list of twenty (20) largest creditors, and Notice of Appearance parties will be served with a copy of this Motion. I will also advertise the sale in the Star Ledger, Business Opportunities Section online for at least two (2) weeks. I am contemporaneously filing a Notice of Proposed Private Sale so that, in addition to the parties-in-interest identified on the Certification of Service filed herewith, creditors will receive notice of the proposed sale.

50. Moreover, I will consider higher and better offers until December 10, 2020, which is seven (7) days prior to the hearing on the Motion. Updated financial information will continue to be provided to the Purchaser and any interested party. The Manager regularly provides me with updated sales and accounts receivable reports and will continue to do so.

51. To be considered a higher and better offer, the initial overbid for the Transferred Assets must be at least $425,000 in cash (with no financing contingency), *plus* an agreement to purchase the accounts receivable for at least the same amount as that set forth in the Agreement.

52. Bidders will be subject to the same terms and conditions as Purchaser as set forth in the Agreement. In the event of competing bids, it is my intention to conduct an auction on the return date of the Motion – after discussing the logistics of same with the Court.

53. I respectfully request that I be authorized to execute any and all documents to effectuate the sale of the Transferred Assets, including any of the IP (specifically, but not limited to, all trademarks), formerly owned by Bowls.

54. Based on the totality of the circumstances, in my business judgment, I submit that the sale on the terms and conditions set forth in the Agreement is fair, reasonable and in the best interests of the Debtor and creditors of this bankruptcy Estate, as it will allow me to fund a Liquidating Plan to be filed in this case, thereby creating a pool of potential monies for distribution to creditors.

55. It is respectfully requested that the Motion be granted.

I hereby certify that the above statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: November 18, 2020                By:      /s/ Andrea Dobin
                                                 ANDREA DOBIN

4816-9664-3282, v. 1